1

2

3

4

5

6                        **UNITED STATES DISTRICT COURT**

7                             **DISTRICT OF ARIZONA**

8    Benjamin Patrick Holden,

9                      Petitioner,                    CV 09-435-TUC-DCB (JM)

10   vs.                                              **REPORT AND**
                                                      **RECOMMENDATION**
11   Charles L. Ryan, et al.,

12                     Respondents.

13

14

15

16          Pending before the Court is Petitioner Benjamin Patrick Holden's Petition for

17   Writ of Habeas Corpus (Doc. 1) filed pursuant to 28 U.S.C. § 2254.  In accordance

18   with the Local Rule – Civil 72, Rules of Practice of the United States District Court

19   for the District of Arizona, and 28 U.S.C. § 636(b)(1), this matter was referred to the

20   Magistrate Judge for report and recommendation.   As explained below, the

21   Magistrate Judge recommends that the District Court, after an independent review of

22   the record, dismiss the Petition with prejudice.

                                           1

1    **I.       RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

2         After a jury trial in the Pima County Superior Court, Holden was convicted on

3    July 21, 2003, for the first degree murder of Daniel Tilley.  The Arizona Court of

4    Appeals described the underlying facts as follows:

5         On July 29, 2002, the victim, T., arrived uninvited at the home of L., an
         acquaintance.  A group of people, including Holden, were gathered at
6         L.'s home.  T., who was both intoxicated and confrontational, entered
         L.'s bedroom, where L. was in bed with an injured leg.  L. and his
7         girlfriend, K., repeatedly asked T. to leave L.'s home, but T. refused.

8              As the argument between L. and T. escalated, L. and K.
         summoned Holden to the bedroom to "get [T.] out of [there]."  Holden
9         asked T. to leave the home but T. refused and advanced upon him,
         holding a ceramic cow's head and large conch shells.   Holden
10        brandished a handgun and ordered T. several times to leave the home,
         threatening to shoot him if he did not comply.  T. refused and Holden
11        shot him in the head, killing him.

12             Holden was arrested approximately one week later, and a grand
         jury indicted him for first degree murder.  The jury rejected Holden's
13        alternative theories of self-defense and accident and found him guilty
         as charged.  The trial court sentenced Holden to life in prison.

14
     *Answer*, Ex. A, p. 2.

15        On direct appeal, Holden raised three claims.  He argued that his right to a fair

16   trial was violated when the trial court allowed into evidence a statement Holden

17   made to the victim, "ask Walter what it feels like to die."  *Answer,* Ex. B, p. 6.  He

18   also argued that he was entitled to jury instructions regarding intent and based on

19   self-defense, defense of premises, defense of third parties, *id*., pp. 13-21, and that his

20   motion for a mistrial should have been granted based on prosecutorial misconduct,

21   *id*., pp. 21-29.   The Court of Appeals found that none of Holden's contentions

22

2

merited relief and affirmed the conviction.  *Id.*, Ex. A, pp. 1-2.  Holden, raising the same arguments, petitioned the Arizona Supreme Court for review.  *Id.*, Ex. C.  The Supreme Court denied review.  *Id.*, Ex. D.

In his petition for post-conviction relief (PCR), Holden alleged a number of claims based on alleged ineffective assistance of counsel at trial and on appeal, and several claims related to alleged error during trial:

> 1.      Ineffective assistance of his trial counsel who failed to consult and present experts in support of Holden's defense that he did not intend to pull the trigger and to corroborate Holden's version of events through bloodstain pattern analysis;

> 2.      Holden was entitled to crime prevention  and unintentional use of force jury instructions and his appellate counsel was ineffective for failing to raise the instruction claims in Holden's direct appeal;

> 3.       Newly-discovered evidence supporting Holden's version of events required a new trial;

> 4.      Prosecutorial misconduct occurred when the State elicited false testimony about the bloodstain evidence;

> 5.      Holden's trial counsel was ineffective because he requested an incorrect and confusing self-defense instruction;

> 6.      Holden's due process rights were violated because the jury reviewed portions of his statement that were supposed to be redacted;

> 7.      Holden's counsel did not seek to have other prejudicial portions of Holden's statement redacted;

> 8.      Holden's trial counsel did not make it clear that it was Holden's decision whether to testify;

> 9.      Holden's trial counsel failed to present evidence of the victim's reputation for violence;

10.     Holden's trial counsel failed to adequately argue for a *Willits* jury instruction based on the police moving evidence at the scene, and appellate counsel failed to raise on appeal the trial court's refusal of such an instruction;

11.     That he was entitled to a new trial because a juror did not disclose his law enforcement associations during voir dire;

12.     Fundamental error occurred because the jury was not properly instructed on the affirmative defense unanimity requirement;

13.     Holden was entitled to addition credit on his sentence under A.R.S. § 13-709(B); and

14.     That the cumulative effect of the errors required a new trial.

*Answer*, Ex. E.  The trial court denied review without analysis.  *Id.*, Ex. F.

Holden raised the same claims in his Petition for Review of the denial of his PCR claims.  *Id.*, Ex. G.  The Court of appeals, in a 29-page Memorandum Decision, analyzed each of Holden's claims and concluded that the trial court had indeed miscalculated his sentence and that questions remained about his trial counsel's advice as to whether Holden should testify at trial.  *Id.*, Ex. H.  The appeals court corrected Holden's sentence and remanded the case to the trial court "for an evidentiary hearing to determine whether Holden has established his counsel was ineffective for depriving him of his right to testify."  *Id.*, p. 29.

Holden then sought review by the Arizona Supreme Court, where he presented the following issues:

A.     Did the Court of Appeals err in finding that Holden was not prejudiced by trial counsel's failure to investigate or present expert testimony on the unintentional trigger-pull phenomenon and bloodstain analysis, which deprived Holden of his right to present his defense to a jury?

4

B.     Did the Court of Appeals err in finding that Holden was not entitled to a crime prevention instruction, which similarly deprived Holden of his rights?

C.     Did the Court of Appeals err in finding that Holden was not prejudiced by the submission to the jury of a tape containing inadmissible and highly prejudicial material that was not redacted as ordered by the trial court?

*Answer*, Ex. I, p. 1.  The Arizona Supreme Court denied review, *id*., Exs. J & K, and the Court of Appeals issued its mandate on August 7, 2008, *id*., Ex. K.

The matter was then returned to the trial court for an evidentiary hearing on the issue of whether Holden's counsel had denied him his right to testify.  *Answer*, Ex. O.  The trial court held the evidentiary hearing on November 25, 2008, and on December 30, 2008, issued its ruling denying the claim.  *Id*., Ex. P.  Holden did not appeal the ruling.

In the Petition now before the Court, Holden raises four claims for relief:

1.     Holden's conviction and sentence violated the Sixth Amendment because trial counsel was ineffective based on his failure to consult and present the necessary experts.

2.     The erroneous denial of Holden's request for a crime prevention jury instruction violated due process under the Fourteenth Amendment.

3.     The State's submission of an unredacted tape to the jury and trial counsel's failure to investigate the tape constituted prosecutorial misconduct and ineffective assistance of trial counsel.

4.     The improper comments made by the prosecutor violated Holden's due process rights.

*Petition*, pp. 14-28.

1    **II.     TIMELINESS UNDER AEDPA**

2          Respondents assert that the Petition, which was filed on August 7, 2009, is

3    untimely because Holden had one year from July 9, 2008, the date on which the

4    Arizona Supreme Court denied review of Holden's PCR petition.  *Answer*, p. 7.

5    However, this argument ignores that the Arizona Court of Appeals had partially

6    granted relief and remanded the case for a hearing on Holden's claim that he was

7    denied the right to testify.  *Answer*, Ex. H, pp. 22-23.  After remand, the trial court

8    denied the claim in a ruling dated December 30, 2008.  *Id.*, Ex. P.  Although he

9    ultimately did not do so, Holden thereafter had 30-days to appeal the denial.

10   Ariz.R.Crim.P. 32.9(c).  Holden filed the instant Petition on August 7, 2009, which is

11   well within the one-year limitation period provided by 28 U.S.C. § 2244(d)(1)(A).

12   **III.    EXHAUSTION AND PROCEDURAL DEFAULT**

13         A state prisoner must exhaust the available state remedies before a federal

14   court may consider the merits of his habeas corpus petition.  *See* 28 U.S.C. §

15   2254(b)(1)(A); *Nino v. Galaza,* 183 F.3d 1003, 1004 (9th Cir.1999).  Exhaustion

16   occurs either when a claim has been fairly presented to the highest state court, *Picard*

17   *v. Connor*, 404 U.S. 270, 275 (1971), or by establishing that a claim has been

18   procedurally defaulted and that no state remedies remain available, *Reed v. Ross*, 468

19   U.S. 1, 11 (1984).

20         Exhaustion requires that a habeas petitioner present the substance of his

21   claims to the state courts in order to give them a "fair opportunity to act" upon these

22   claims.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999).  A claim has been

"fairly presented" if the petitioner has described the operative facts and legal theories on which the claim is based. *Picard v. Connor*, 404 U.S. 270, 277-78 (1971); *Rice v. Wood*, 44 F.3d 1396, 1403 (9th Cir. 1995). The operative facts must be presented in the appropriate context to satisfy the exhaustion requirement. The fair presentation requirement is not satisfied, for example, when a claim is presented in state court in a procedural context in which its merits will not be considered in the absence of special circumstances. *Castille*, 489 U.S. at 351. An exact correlation of the claims in both state and federal court is not required. *Rice,* 44 F.3d at 1403. However, the substance of the federal claim must have been fairly presented to the state courts. *Chacon v. Wood*, 36 F.3d 1459, 1467 (9th Cir.1994) (citations omitted).

A petitioner may also exhaust his claims by either showing that a state court found his claims defaulted on procedural grounds or, if he never presented his claims in any forum, that no state remedies remain available to him. *See Jackson v. Cupp*, 693 F.2d 867, 869 (9th Cir. 1982). "To exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32," *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir.1994), and then present his claims to the Arizona Court of Appeals. *See Swoopes v. Sublett,* 196 F.3d 1008, 1010 (9th Cir.1999).

The Arizona Rules of Criminal Procedure provide that claims not presented to the state courts on direct review or through collateral review are generally barred from federal habeas review because an attempt to return to state court to present the

1    claims would be futile in most cases.   *See* Ariz.R.Crim.P. 32.1(d)-(h); 32.2(a);

2    32.4(a); and 32.9(c).  Because these rules are consistently and regularly followed and

3    are independent of federal law, their application will procedurally bar subsequent

4    review of the merits of that claim in federal court.  *Stewart v. Smith*, 536 U.S. 856

5    (2002).  A petitioner can avoid the bar on review of defaulted claims only where he

6    can demonstrate that a miscarriage of justice would result, or where he can establish

7    cause for his noncompliance and the actual prejudice that results.  *Schlup v. Delo*,

8    513 U.S. 298, 321 (1995); *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).

9        **A.    Ground 2: Failure to Instruct Jury on Crime Prevention**

10        Respondents contend that Holden is in procedural default of the portion of

11   Ground 2 where he alleges that the trial court violated his Fourteenth Amendment

12   right to due process by failing to give his requested crime prevention instruction.

13   Specifically, Respondents argue that Holden did not raise a due process argument in

14   his original PCR petition or in his petition for review.  *Answer*, p. 12.

15        Citing federal authority, including the Fourteenth Amendment, Holden argues

16   in his PCR petition that the crime prevention instruction was required and asserts that

17   "[f]ailure to instruct on a defendant's theory of the case where there is evidence to

18   support the instruction violated the Due Process clause and the Sixth Amendment and

19   is reversible per se as it deprives the defendant of a fair trial."  *Answer*, Ex. E, p. 13.

20   The argument was reiterated on appeal.  *Id*., Ex. G, pp. 13.  As such, this claim was

21   fairly presented and exhausted.

22

8

**B.      Ground 3: Prosecutorial Misconduct Unredacted Statement**

Respondents also contend Holden failed to raise a portion of Ground 3 in state court proceedings.  Holden contends that the submission of the unredacted tape to the jury constituted prosecutorial misconduct.  *Petition*, p. 23.  A review of Holden's opening brief to the court of appeals in his direct appeal shows that he did argue prosecutorial misconduct, but he makes no mention of the unredacted statements. *Answer*, Ex. E.  Holden does raise the claim in his PCR in the context of ineffective assistance of counsel, but not as one of prosecutorial misconduct.  In fact, claims of prosecutorial misconduct are precluded from consideration in Arizona post-conviction proceedings under Rule 32.2(a)(3), Ariz.R.Crim.P., because they could have been raised on appeal but were not.  This claim was not raised in the state courts as a claim for prosecutorial misconduct and it is therefore not properly exhausted.

**C.      Ground 4: Prosecutorial Misconduct for Improper Comments**

Respondents next contention is that Holden did not exhaust his claim that improper comments made by the prosecutor in his closing argument amounted to misconduct and violated Petitioner's right to due process.  *Answer*, p. 13.  They contend that while the claim was raised by Holden on direct appeal, it was never asserted as a due process violation.  *Id*.

Turning again to the brief on appeal, Holden extensively argued several instances of prosecutorial misconduct.  *Answer*, Ex. B, pp. 21-29.  But, as Respondents assert, a claim is "fairly presented" to the state court only when a petitioner has described the operative facts and the federal legal theory upon which

9

1   the claim is based.  *See, e.g., Picard*, 404 U.S. at 275-78("[W]e have required a state

2   prisoner to present the state courts with the same claim he urges upon the federal

3   courts.").  A claim is only "fairly presented" to the state courts where a petitioner has

4   "alert[ed] the state courts to the fact that [he] was asserting a claim under the United

5   States Constitution."  *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir.2000)

6   (quotations omitted).  The prosecutorial misconduct claims raised by Holden in the

7   state court were based entirely on state law and no mention was made of federal law.

8   Because Holden failed to alert the state court of the federal basis for the claim, it is

9   unexhausted.

10          **D.   Procedural Default**

11          The portion of Ground 3 discussed above and all of Ground 4 is procedurally

12   defaulted.  Under the Arizona criminal rules, claims not previously presented to the

13   state courts either on direct review or in post-conviction proceedings are generally

14   barred from federal review because it would be futile to attempt to return to state

15   court to present them unless they fit into one of the limited exceptions.

16   Ariz.R.Crim.P. 32.2(a) (preclusion), 32.4(a) (time bar), 32.9(c) (petition must be filed

17   within 30 days of trial court decision).  Holden does not argue that his claims fit any

18   of the exceptions.  *See* Ariz.R.Crim.P. 32.1(d)-(h).

19          In circumstances of procedural default, a federal court may only hear a claim

20   where the petitioner "can demonstrate cause for the default and actual prejudice as a

21   result of the alleged violation of federal law, or demonstrate that failure to consider

22   the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at

1  750.  Holden offers neither cause for the default nor argument that a fundamental

2  miscarriage of justice will result should the claims not be considered.  Additionally,

3  neither is apparent to the Court based on the record presented.  These claims are

4  unexhausted, procedurally defaulted and, therefore, not subject to review by the

5  Court.

6  **IV.   LEGAL STANDARDS**

7        Under the AEDPA, a federal court "shall not" grant habeas relief with respect

8  to "any claim that was adjudicated on the merits in State court proceedings" unless

9  the state decision was (1) contrary to, or an unreasonable application of, clearly

10  established federal law as determined by the United States Supreme Court; or (2)

11  based on an unreasonable determination of the facts in light of the evidence presented

12  in the State court proceeding.  28 U.S.C. § 2254(d).  *See Williams v. Taylor*, 120

13  S.Ct. 1495 (2000).  A state court's decision can be "contrary to" federal law either (1)

14  if it fails to apply the correct controlling authority, or (2) if it applies the controlling

15  authority to a case involving facts "materially indistinguishable" from those in a

16  controlling case, but nonetheless reaches a different result.  *Van Tran v. Lindsey*, 212

17  F.3d 1143, 1150 (9th Cir.2000).

18        In determining whether a state court decision is contrary to federal law, the

19  court must examine the last reasoned decision of a state court and the basis of the

20  state court's judgment.  *Packer v. Hill*, 277 F.3d 1092, 1101 (9th Cir.2002).  A state

21  court's decision can be an unreasonable application of federal law either (1) if it

22  correctly identifies the governing legal principle but applies it to a new set of facts in

1   a way that is objectively unreasonable, or (2) if it extends or fails to extend a clearly

2   established legal principle to a new context in a way that is objectively unreasonable.

3   *Hernandez v. Small*, 282 F.3d 1132 (9th Cir. 2002).

4   **V.    LEGAL DISCUSSION**

5       **A.    Ineffective Assistance of Counsel**

6           Each of Holden's remaining claims alleges ineffective assistance of counsel.

7   The operative legal standard applicable to these claims is a familiar one, addressed by

8   the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).

9   The standards enunciated there by the Court are applied unless there is other

10  Supreme Court precedent directly on point.  *See Wright v. Van Patten*, 128 S.Ct. 743,

11  746 (2008).   Under *Strickland*, a petitioner must show both deficient performance

12  and prejudice in order to establish that counsel's representation was ineffective.  466

13  U.S. at 687.  In the context of habeas claims evaluated under § 2254(d)(1) standards,

14  the question "is not whether a federal court believes the state court's determination

15  was incorrect but whether that determination was unreasonable– a substantially

16  higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

17              **1.    Ground 1: Lack of Expert Testimony**

18          In Ground 1, Holden contends trial counsel was ineffective because he failed

19  to investigate and present an explanation of the unintentional trigger pull

20  phenomenon and bloodstain evidence in support of his defenses.  The Arizona Court

21  of Appeals offered the last reasoned decision on these claims in its Memorandum

22  Decision addressing Holden's PCR petition.  *Answer*, Ex. A., pp. 4-10.   Holden has

not shown the appeals court's application of *Strickland* to these claims to be unreasonable.

In his PCR proceedings, Holden offered the opinion of Dr. Roger Enoka, a human movement consultant, to support the claim that his counsel was ineffective for failing to present expert testimony that unintentional trigger-pull phenomenon led to Holden shooting Tilley.  Dr. Enoka opined that "conditions at the time the weapon was discharged . . . [were] consistent with those shown to precipitate . . .  the unintentional discharge of a firearm."  *Petition*, p. 16.  The opinion focused on the high level of tension in the room, the movement of Tilley toward Holden, the proximity of Tilley to the gun, the backward step by Holden away from Tilley, and the physical constraints created by an object on the floor and the step between the rooms.  *Id.*

Rejecting Holden's claim in his PCR proceedings, the Court of Appeals addressed only the prejudice prong of *Strickland*.  The court reasoned that Dr. Enoka "would not conclude with certainty the evidence showed the discharge had been accidental but simply concluded the circumstances surrounding the shooting 'could have caused Mr. Holden to hold the gun more firmly and thereby unintentionally pull [] the trigger.'"  *Answer*, Ex. H, p. 9.  The court then added that:

> Many of the circumstances on which [Dr. Enoka] based that conclusion were taken from Holden's version of events- a version that was discredited on many points by the testimony of other witnesses.  In addition, had the jury believed Holden's version of the events, the jury could have drawn many of the same inferences as Enoka without the benefit of his expert testimony. *See Gorney v. Meaney*, 214 Ariz. 226,

13

1
2

¶ 15, 150 P.3d 799, 804 (App.2007) (expert testimony inappropriate when jury can determine issue without it).

3
4
5
6
7
8

Thus, although Enoka's testimony would have provided a scientific explanation for Holden's theory that he had accidentally pulled the trigger, it would not have been enough to change the outcome of this case, given evidence that strongly contradicted Holden's assertion that the gun had discharged accidentally. Holden discharged the gun within three inches of Danny's head, he did so after repeatedly threatening to kill Danny, and none of the three eyewitnesses to the shooting corroborated that Danny aggressively lunged at Holden. Therefore, although the testimony most likely would have been relevant and admissible, Holden did not suffer prejudice by its absence and the trial court did not err by dismissing the claim.

*Answer*, Ex. H, pp. 9-10.

9
10
11
12
13
14
15
16
17
18
19
20
21
22

Holden contends that Dr. Enoka's opinion would have countered the testimony of Detective Amado that a close-range wound could not have resulted from an unintentional firing. He also asserts that Dr. Enoka's testimony would have educated the jurors about unintentional firings and the failure to present such evidence prejudiced him at trial. *Petition,* p. 17. The problem with Holden's argument is that it ignores substantial elements of the Court of Appeals' rationale. He does not dispute that he repeatedly threatened to kill Danny and he offers nothing to undermine the appellate court's finding that "none of the three eyewitnesses to the shooting corroborated that Danny aggressively lunged at Holden." In fact, Dr. Enoka's opinion confirms that neither witness whose testimony he was provided was able to see what happened at the time the weapon was discharged. *Answer,* Exhibit I, App. 1, p. 3. Holden also ignores Dr. Enoka's statement that there was not "enough evidence to state with certainty that the discharge was unintentional." *Id.* Under 28

U.S.C. § 2254(d), it is Holden's burden to show that the state court's opinion was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.   Without addressing this evidence, and given the deferential standard of review, the state court's factual determination supporting its finding that Holden suffered no prejudice cannot be characterized as unreasonable.

Holden also contends his counsel was ineffective for failing to present expert analysis of the bloodstain evidence at the crime scene.   Holden's expert, Tom Bevel, opined that the bloodstain evidence corroborates Holden's description of Tilley's position when the gun was discharged.  Specifically, Holden asserts that the Court of Appeals improperly discounted the significance of Bevel's conclusion that Tilley could have remained upright for a few moments after being shot because such evidence "supports an inference that Tilley could have moved backward after being shot, which increased the likelihood that a jury would accept Holden's claim that Tilley had moved close to him just before the discharge." Petition, p. 18.

The Court of Appeals rejected the argument that Holden's counsel was ineffective on this point, finding that:

> Bevel's opinion does not substantially conflict with the state's theory, which Holden has inaccurately characterized.   Specifically, Holden contends that state argued that Danny 'was backed in the corner of the bed' when he was shot- a proposition Bevel would have contradicted. In fact, the state only claimed Danny's head was 'backed in the corner of that bed' when he was found dead.  In making this statement, the state relied on photographs that showed a large pool of blood where Danny's head had rested after he was shot.  The state did not attempt to pinpoint exactly where Danny had been standing when he was shot but did argue Danny could not have fallen back by the corner of the bed if he had been standing in the doorway, as Holden claimed.

*Answer*, Ex. H, p. 6.   Rather than asserting the unreasonableness of the Court of Appeals' decision, Holden merely reiterates the assertions he made before the Court of Appeals.   He argues that Bevel's opinion "contradicts one of the State's key points in Closing Argument (that Tilley was standing by the corner of the bed) and supports Holden's claim that Tilley moved close to him just before the gun fired." *Petition*, p. 19.   However, the Court of Appeals addressed this claim by noting that the State did not attempt to pinpoint Tilley's location when he was shot and simply argued that, based on where his head came to rest, he could not have been standing in the doorway.   *Answer*, Ex. H, p. 6.   Nothing Holden offers calls into doubt the reasonableness of the Court of Appeals' conclusion.

Holden next asserts that his claim of self-defense would have been bolstered if his trial counsel had presented to the jury Bevel's opinion that Tilley's arm was raised when he was shot.   *Petition*, p. 19.   Rejecting this claim, and finding that Holden was not prejudiced by the omission of Bevel's testimony at trial, the Court of Appeals stated:

> But Bevel never stated that such evidence supports Holden's contention that Danny had been reaching for the gun.   Rather, Bevel opines that the bloodstains are consistent with Danny's hand having been up by his head or face, rather than Danny reaching out in front of him.

*Answer*, Ex. H, p. 7.   Holden points out that, given Danny Tilley was shot from no more than three inches away from his head, Bevel's opinion is consistent with Holden's claim that Tilley was reaching for the gun when it was fired.   However,

1  reviewing Bevel's statement establishes that he was not requested to offer an opinion

2  on that issue.  *Answer*, Exhibit I, App. 2.  The only mention of this issue appears

3  when Bevel is asked and confirms that "it is true that Benjamin Holden asserted that

4  he was backing out the bedroom doorway when Tilley lunged at him and the gun

5  discharged?"  *Id.*, p. 11.  Bevel never adopts Holden's assertion as his own opinion.

6  As it stands, Bevel's opinion about the location of Tilley's hands when he was shot is

7  consistent with a defensive reaction to the gun.  When the ambivalence of this

8  evidence is coupled with the Court of Appeals' unchallenged conclusion that, "none

9  of the three eyewitnesses to the shooting corroborated that Danny aggressively

10  lunged at Holden," *Answer*, Ex. H, pp. 9-10, the rejection of this claim by the state

11  court cannot be rejected as unreasonable.

12       **2.       Ground 2: Failure to Instruct Jury on Crime Prevention**

13       Holden next claims that his appellate counsel was ineffective for failing to

14  challenge the trial court's denial of his request for a crime prevention instruction.

15  The *Strickland* standards apply to appellate counsel as well as trial counsel.  *Smith v.*

16  *Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th

17  Cir.1989).  As there is no obligation to raise meritless claims on appeal, *Pollard v.*

18  *White*, 119 F.3d 1430, 1435 (9th Cir.1997), a petitioner must show that, but for

19  counsel's errors, he probably would have prevailed on appeal, *id.* at 1434 n. 9.

20       Although the claim was not raised on direct appeal, the Arizona Court of

21  Appeals addressed the substantive question of whether the trial court should have

22  included the crime prevention instruction at trial within the context of Holden's post-

conviction claim of ineffective assistance of counsel.   The court concluded that

Holden was not entitled to the instruction because there was no evidence to support

the instruction:

> there was no evidence Danny was threatening anyone with a deadly
> weapon or dangerous instrument at the time Holden entered the
> bedroom in an effort to make Danny leave.   And even assuming the
> cow's head or conch shells could be considered dangerous instruments,
> the record is clear Holden continued to point the gun at Danny well
> after Danny had put any such items down.

*Answer*, Ex. H, p. 13.

"Factual determinations by state courts are presumed correct absent clear and

convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the

merits in a state court and based on a factual determination will not be overturned on

factual grounds unless objectively unreasonable in light of the evidence presented in

the state court proceedings, § 2254(d)(2)."  *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).  Here, it is Holden's burden to show by clear and convincing evidence that

the state court's determination that Danny Tilley was shot "well after" he put any

such items down was objectively unreasonable.  Holden dances around the factual

findings of the state court but never offers anything convincing to undermine them.

For example, he cites a witness who testified that Tilley had tried to hit Holden with

the ceramic cow head, but admits this was before Holden had pulled out the gun.

*Petition*, p. 22.  He cites other testimony where a witness could not recall if Tilley

had put down the shells, and offers that, "*If* Tilley still had the giant, heavy shells . . .

he could have hurled them and injured anyone there."  *Id*. (italics added).  A state

1    court's factual finding is unreasonable when it is "so clearly incorrect that it would

2    not be debatable among reasonable jurists."  *Jefferies v. Wood*, 114 F.3d 1484, 1500

3    (9th Cir.1997).   Holden's factual assertions do not establish that the state court's

4    findings are "clearly incorrect."   At best, he has offered points which might merit

5    some debate; however, that the factual findings are debatable renders them

6    reasonable under the standards of the AEDPA.  Accordingly, Holden is not entitled

7    to federal habeas relief on this claim.

8                    **3.    Ground 3: Unredacted Tape**

9            The remaining claim involves an audio tape of Holden's statement to police.

10   The tape was supposed to be redacted to remove references to allegations that Holden

11   had held a woman against her will several days after Tilley's death because she owed

12   him money.  *Petition*, p. 23.  The tape was apparently submitted unredacted to the

13   jury for use during deliberations.  Holden claims that this amounted to ineffective

14   assistance of counsel.

15           The Court of Appeals rejected this claim because Holden could not show he

16   was prejudiced by the submission of the tape "because he had not shown any of the

17   twelve jurors listened to the tape during their deliberations."  *Answer*, Ex. H, p. 27.

18   In an attempt to overcome this finding, Holden relies on *United States v.*

19   *Cunningham*, 145 F.3d 1385 (D.C. Cir.1998), for the proposition that the court must

20   presume the jurors listened to the tape and, therefore, "prejudice must be presumed

21   and a new trial granted."

22

1    In *Cunningham*, the jury was inadvertently provided unredacted 911 calls and

2    police radio transmissions that were not supposed to be admitted into evidence.  In a

3    post-trial meeting with prosecutors and defense counsel, several jurors mentioned

4    that they had the unadmitted recording with them during deliberations.  145 F.3d at

5    1390.  After this discovery, the defendant moved for a mistrial on the ground that his

6    Sixth Amendment right to confront witnesses was violated because he could not

7    cross-examine the individuals whose statements appeared on the tape.  *Id*. at 1391.

8    The trial court denied the motion, but the court of appeals reversed.  In doing so, the

9    court stated that, "absent any compelling evidence to the contrary," it would be

10   presumed that the jurors listened to the tape.  *Id*. at 1395.

11   As a threshold matter, *Cunningham*, a decision from the District of Columbia

12   Circuit, is not "clearly established federal law as determined by the United States

13   Supreme Court" upon which habeas relief can be founded.  *See* 28 U.S.C. § 2254(d).

14   Additionally, *Cunningham* did not involve a claim of ineffective assistance of

15   counsel.  Rather, the petitioner there raised a stand-alone claim that the inadvertent

16   submission of the unredacted 911 calls from several non-testifying individuals

17   violated the Sixth Amendment's Confrontation Clause.  *Cunningham*, 145 F.3d at

18   1394.  Thus, the claim raised in *Cunningham* is quite unlike the ineffective assistance

19   of counsel claim Holden raised in the state court and raises here.

20   Having concluded that the standards described in *Cunningham* are

21   inapplicable to Holden's claim, the Court must determine the applicable standard and

22   whether that standard was reasonably applied by the state court.  In relation to

1  ineffective assistance of counsel claims, United States Supreme Court authority does,

2  under limited circumstances, provide the presumption of prejudice Holden seeks.  In

3  *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court held that prejudice

4  could be presumed in an narrow range of ineffective assistance of counsel claims

5  without inquiring into counsel's actual performance "if counsel entirely fails to

6  subject the prosecution's case to meaningful adversarial testing."  Id 466 U.S. 648,

7  659 (1984).  In *Cronic*, the Court "identified three situations implicating the right to

8  counsel that involved circumstances 'so likely to prejudice the accused that the cost

9  of litigating their effect in a particular case is unjustified.'" *Bell v. Cone*, 535 U.S.

10  685, 695 (2002), (quoting *Cronic*, 466 U.S. at 658–59)).  The three exceptional

11  situations identified in *Chronic* involve a complete denial of counsel, an entire failure

12  of counsel to subject the prosecution's case to meaningful adversarial testing, or

13  situations in which no attorney could provide effective assistance.  *Cronic*, 466 U.S.

14  at 659-60.  In these rare circumstances, a petitioner is spared "the need of showing

15  probable effect upon the outcome, and have simply presumed such effect," because

16  "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is

17  unnecessary." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002); *See also Roe v. Flores–

18  Ortega,* 528 U.S. 470, 483 (2000) (In *Cronic* and other cases "we held that the

19  complete denial of counsel during a critical stage of a judicial proceeding mandates a

20  presumption of prejudice . . . .").

21      Here, Holden does not argue that the representation provided by his counsel

22  was so lacking that he is entitled to the presumption of prejudice described in *Cronic*.

21

1   Nor could he.  Even a cursory review of the record establishes that his counsel was

2   present and subjected the prosecution's case to meaningful adversarial testing.  Thus,

3   even if the Court presumes, as the Arizona Court of Appeals did, that Holden's

4   counsel's representation was deficient and fell below an objective standard of

5   reasonableness, *Strickland*, 466 U.S. at 688, the cases nevertheless emphasize that

6   mistake-free counsel is not guaranteed by the Sixth Amendment, *United States v.*

7   *Gonzalez-Lopez*, 548 U.S. 140, 147 (2006).   As such, Holden must establish

8   prejudice under *Strickland*.

9        To establish prejudice, Holden must show that "there is a reasonable

10   probability that, but for counsel's unprofessional errors, the result of the proceeding

11   would have been different.  A reasonable probability is a probability sufficient to

12   undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Applying this

13   standard, the Arizona Court of Appeals noted that:

14            Holden submitted the affidavit of one of the jurors who said
         only that she could not remember whether the jury had listened to the
15       tape but 'may have done so.'  In addition, he submitted two affidavits
         by an investigator who said two other jurors told him they could not
16       remember having listened to the tape and he could not find two of the
         jurors.
17
18   *Answer*, Ex. H, p. 27 n. 8.  Based on this evidence, which is identical to what he

19   relies on in the instant petition, the Court of Appeals concluded that, "Holden cannot

20   show he was prejudiced by the state's failure to redact the final portion of the tape

21   because he has not shown any of the twelve jurors listened to the tape during their

22   deliberations."  *Id*., Ex. H, p. 27.

22

1       As discussed above, the state court applied the correct legal standard to

2   Holden's ineffective assistance claim.   As such, this Court can reject the Court of

3   Appeals' conclusion only if it determines that the standard was applied "in a way that

4   is objectively unreasonable."   28 U.S.C. § 2254(d); *Hernandez v. Small*, 282 F.3d

5   1132 (9th Cir. 2002).   Under this standard, even a strong case for relief will not

6   necessarily render the state court's decision unreasonable.   *Harrington v. Richter*,

7   562 U.S. ---, 131 S.Ct. 770, 776 (2011).   To obtain relief, Holden must show that the

8   state court's ruling on this claim was "so lacking in justification that there was an

9   error well understood and comprehended in existing law beyond any possibility for

10   fairminded disagreement." *Id*. at 786-87.

11       Holden, in urging a presumption of prejudice, largely avoided arguing

12   prejudice.   He does counter the state court's finding of no prejudice noting that two

13   jurors stated that they may have listened to the tape, another told his investigator a

14   similar story, and that two jurors could not be located. *Petition*, p. 24.   He also notes

15   that both the prosecution and the defense urged the jurors to listen to the tape during

16   deliberations and argues, as such, "it is virtually inconceivable that the jury did not

17   do so." *Id*. at 24-25.   However, even accepting this latter assertion as fact, it does not

18   foreclose fairminded disagreement on this claim.   Even under Holden's version of

19   events, the unredacted statement made so little impact on the three jurors who

20   admitted they might have listened to it, that they cannot be sure they did in fact listen

21   to it.   A fairminded argument could be made that if the unredacted portions of the

22   statement had impacted their decision, they would have recalled having listened to it

1  and being impacted by what was said.  This factor alone prevents this Court from

2  concluding that the state court's decision was objectively unreasonable.

3      As a result, Holden has not satisfied the prejudice prong of the *Strickland*

4  standard and "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly

5  established Federal law.' " *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (quoting 28

6  U.S.C. § 2254(d)(1)).   As such, under the terms of § 2254(d)(1), relief is

7  unauthorized.

8  **V.      RECOMMENDATION**

9      Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the

10  District Court, after its independent review, **deny** Holden's Petition for Writ of

11  Habeas Corpus (Doc. 1).

12      This Recommendation is not an order that is immediately appealable to the

13  Ninth Circuit Court of Appeals.   Any notice of appeal pursuant to Rule 4(a)(1),

14  Federal Rules of Appellate Procedure, should not be filed until entry of the District

15  Court's judgment.

16      However, the parties shall have fourteen (14) days from the date of service of

17  a copy of this recommendation within which to file specific written objections with

18  the District Court.  *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the

19  Federal Rules of Civil Procedure.   Thereafter, the parties have fourteen (14) days

20  within which to file a response to the objections.  If any objections are filed, this

21  action should be designated case number: **CV 09-435-TUC-DCB**.  Failure to timely

22  file objections to any factual or legal determination of the Magistrate Judge may be

24

considered a waiver of a party's right to *de novo* consideration of the issues.  *See*

*United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003)(*en banc*).

Dated this 28th day of June, 2012.


Jacqueline Marshall
United States Magistrate Judge